# IN THE SUPREME COURT OF CALIFORNIA

ARAM BONNI,

Plaintiff and Appellant,

v.

ST. JOSEPH HEALTH SYSTEM et al.,

Defendants and Respondents.

S244148

Fourth Appellate District, Division Three

G052367

Orange County Superior Court

30-2014-00758655

---

July 29, 2021

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Groban, and Jenkins concurred.

Justice Groban filed a concurring opinion.

---

BONNI v. ST. JOSEPH HEALTH SYSTEM

S244148

Opinion of the Court by Kruger, J.

Under California law, hospitals must use a process of professional peer review to evaluate physicians' qualifications for medical staff privileges. (See Bus. & Prof. Code, §§ 805, 809–809.9.) Because the loss of privileges can significantly limit a physician's ability to practice medicine, peer review proceedings are a frequent subject of litigation in California courts. And as the number of lawsuits challenging peer review determinations has grown, so too has the number of motions to strike under Code of Civil Procedure section 425.16. Familiarly known as the anti-SLAPP statute, this provision allows defendants to seek early dismissal of unmeritorious claims arising from protected speech and petitioning activities. (Code Civ. Proc., § 425.16, subd. (b).)

We have previously held that the anti-SLAPP statute's protections extend to speech and petitioning in connection with hospital peer review. (See *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192.) This case requires us to consider the scope and limits of those protections. Plaintiff, a physician, alleges the defendant hospitals and members of its medical staff unlawfully retaliated against him for raising concerns about patient care. He says this retaliation began with the suspension of his staff privileges and culminated in the termination of those privileges after peer review. The hospitals seek to strike the retaliation claims under the anti-SLAPP statute. They contend that any claim arising from the peer

1

review process necessarily targets protected speech or petitioning activity and therefore must be afforded anti-SLAPP protection. We hold otherwise. While some of the forms of retaliation alleged in the complaint — including statements made during and in connection with peer review proceedings and disciplinary reports filed with official bodies — do qualify as protected activity, the discipline imposed through the peer review process does not. Thus, while the hospitals may seek to strike some of the physician's retaliation claims, they are not entitled to wholesale dismissal of these claims under the anti-SLAPP law.

## I.

## A.

Aram Bonni, M.D., is a surgeon specializing in obstetrics and gynecology who began practicing in 1998. He received staff privileges at defendant Mission Hospital Regional Medical Center (Mission) in 2002 and at an affiliated hospital, defendant St. Joseph Hospital of Orange (St. Joseph), in 2010. Bonni would face peer review proceedings at both hospitals, which would ultimately lead to a settlement with St. Joseph's wherein Bonni agreed to resign and to a decision terminating Bonni's staff privileges at Mission.

The proceedings at St. Joseph's began not long after Bonni received staff privileges in 2010. That same year, Bonni performed a surgery proctored and assisted by the hospital's chief of obstetrics and gynecology, one of the named defendants. Like several of Bonni's surgeries, the surgery involved use of a robotic assistant to supply three-dimensional imaging and cut and cauterize tissue. On this occasion, the robot's camera provided only two-dimensional imaging instead of three, and

Bonni complained to the assisting doctor about the malfunction. The surgery resulted in patient complications. Over the next few weeks, Bonni performed two more surgeries in which similar problems occurred. Again the patients suffered complications; again Bonni raised concerns about the performance of the robotic assistant.

After the third surgery, Bonni was advised that St. Joseph was summarily suspending his staff privileges. The subsequent written notice from St. Joseph's chief of staff — one of the defendants here — asserted that in light of "serious and avoidable injuries to patients" in the three cases, suspension was necessary to avoid "imminent danger" to St. Joseph's patients. (See Bus. & Prof. Code, § 809.5, subd. (a).)

As permitted by the hospital staff bylaws, Bonni sought an informal interview with the hospital's medical executive committee. After the interview, the medical executive committee elected to continue the suspension and recommended termination of Bonni's privileges. Based on the length of the suspension, St. Joseph was required to, and did, report its disciplinary action to the Medical Board of California and the National Practitioner Data Bank. (See Bus. & Prof. Code, § 805, subd. (e); 42 U.S.C. § 11133(a)(1).)

Bonni challenged the suspension and termination recommendation and requested a formal hearing before a hospital hearing committee composed of members of the hospital staff. After a lengthy series of evidentiary hearings, the hearing committee determined that the medical executive committee had sustained its burden on three of 18 charges against Bonni but had not shown by a preponderance of the

evidence that either the summary suspension or the termination recommendation was warranted.

The medical executive committee requested an administrative appeal, whereupon the parties settled. The committee dropped its appeal, Bonni agreed to resign and release the hospital and its staff from any claims, and the parties agreed on the language to be used in the required further reports to the Medical Board of California and National Practitioner Data Bank concerning the disciplinary measures taken against Bonni. (See Bus. & Prof. Code, § 805, subd. (e); 42 U.S.C. § 11133(a)(1).)

In the meantime, a similar story was unfolding at Mission. In October 2009, Bonni began to voice concerns about robot-assisted surgeries at Mission. In December, Bonni performed one such surgery. According to Bonni, the robot's camera, tissue-cutting scissors, and cauterizing tool all malfunctioned. The patient experienced complications.

In the wake of that surgery, Mission initiated review of Bonni's performance over the preceding five years. After an investigation, a peer review committee recommended that Bonni's privileges be suspended pending further training in robotic procedures, and Mission's chief of staff, a defendant here, imposed a summary suspension.

While the suspension was under review, Bonni provided Mission's medical executive committee previous communications about robotic-surgery issues. Apparently unmoved, the committee voted to continue the suspension until Bonni completed additional training. As with the St. Joseph suspension, the length of the suspension triggered a duty to file

reports with the Medical Board of California and the National Practitioner Data Bank.

At the same time, Bonni's privileges were set to lapse, and he submitted an application for reappointment. (See Cal. Code Regs., tit. 22, § 70701, subd. (a)(7) [physicians must seek reappointment at least once every two years].) Mission's medical executive committee recommended denial of the application.

Bonni invoked his right to a hearing before Mission's judicial review committee, a panel of five doctors. The judicial review committee considered the reasonableness of Bonni's suspension but did not directly address his reappointment. In support of suspension, Mission's medical executive committee submitted approximately 125 charges arising from 19 cases at Mission and, on the ground that they likewise demonstrated lapses in skill or judgment, the three problematic 2010 surgeries at its affiliated hospital, St. Joseph. After considering extensive testimony, the committee unanimously concluded that the original summary suspension was justified, but by a divided vote concluded continuation of the suspension was no longer warranted. The committee found eight of the 125 charges substantiated. The eight sustained charges related principally to documentation and surgery scheduling issues; according to the final report, "none resulted in poor patient outcomes related to issues raised in these charges."

Both sides appealed to Mission's appellate committee. The appellate committee concluded that the initial suspension was warranted at the time; that whether continuation of the suspension was still warranted was a matter outside the jurisdiction of the judicial review committee and appellate

committee (see *Sadeghi v. Sharp Memorial Medical Center Chula Vista* (2013) 221 Cal.App.4th 598, 615); and, finally, that the denial of Bonni's reappointment application was reasonable. The appellate committee recommended that Mission's board of trustees find the summary suspension warranted and deny the pending application for reappointment. The board of trustees adopted the committee's recommendations and denied Bonni renewal of his staff privileges.

## B.

Bonni sued St. Joseph, Mission, various affiliated entities, and eight individual doctors involved in the disciplinary process (collectively the Hospitals). Bonni's first cause of action alleged that the Hospitals unlawfully retaliated against him for raising patient safety concerns by summarily suspending him, reporting his suspensions to the state medical board, subjecting him to lengthy and humiliating peer review proceedings, defaming him, and ultimately terminating his hospital privileges. (See Health & Saf. Code, § 1278.5; Bus. & Prof. Code, §§ 510, 2056.) Bonni also alleged that St. Joseph had retaliated against him by fraudulently inducing him to enter into their settlement agreement and then breaching that agreement. Based on the same conduct, Bonni also brought causes of action against St. Joseph for breach of contract and rescission of the agreement.

The Hospitals filed an anti-SLAPP motion seeking to strike the retaliation cause of action. (See Code Civ. Proc.,

§ 425.16 (section 425.16).)[1] They argued that this cause of action arose from medical peer review proceedings; that medical peer review proceedings are protected activity under this court's decision in *Kibler v Northern Inyo County Local Hospital Dist., supra*, 39 Cal.4th at pages 198–199 (*Kibler*); and thus that Bonni must demonstrate some merit to his claim in order to proceed (see § 425.16, subd. (b)(1)). They further argued that Bonni could not establish any merit because the disciplinary actions were taken for nonretaliatory reasons related to Bonni's medical competence and because Bonni had signed a release as part of the settlement agreement relinquishing any right to sue St. Joseph and its committees and staff.

The trial court granted the Hospitals' motion. As a threshold matter, the trial court agreed with the Hospitals that "[t]he gravamen of the claim is based on defendants' protected peer review activities," so the anti-SLAPP statute applied to the retaliation cause of action under *Kibler*, *supra*, 39 Cal.4th 192. The trial court then concluded the cause of action lacked the requisite merit to proceed. It found, as to St. Joseph and related defendants, that Bonni could not show any specific complaints he made about patient care, and as to Mission and related defendants, that Bonni had raised safety concerns, but had failed to overcome Mission's evidence that his performance, not these complaints, was the true reason for any adverse actions.

---

[1] A "SLAPP" is a " 'strategic lawsuit against public participation' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1), and special motions to strike under section 425.16 are commonly referred to as "[a]nti-SLAPP motions" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*)).

The Court of Appeal reversed. (*Bonni v. St. Joseph Health System* (2017) 13 Cal.App.5th 851 (*Bonni*).) It concluded that the Hospitals' "alleged retaliatory motive in suspending plaintiff's staff privileges and subjecting him to a lengthy and allegedly abusive peer review proceeding is the basis on which liability is asserted." (*Id.* at p. 864.) The court reasoned that the anti-SLAPP statute does not protect actions taken with a retaliatory motive, and so the trial court erred in granting the Hospitals' special motion to strike. (*Ibid.*)

We granted review and held this case pending resolution of *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*), which addressed the role that an allegation of illicit motive plays in determining whether retaliation and discrimination claims arise from protected activity for anti-SLAPP purposes. We explained in *Wilson* that allegations of retaliatory or discriminatory motive do not categorically remove retaliation and discrimination claims from the ambit of an anti-SLAPP motion. Such claims, we said, are "necessarily *also* based on the [defendant's] alleged acts — that is, the various outward 'manifestations' of the [defendant's] alleged wrongful intent." (*Id.* at pp. 886–887.) Notwithstanding assertions of an illicit motive, "[i]f the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply." (*Id.* at p. 887.) We disapproved the *Bonni* court's contrary conclusion. (*Id.* at p. 892.)

But *Wilson* only partially resolved the issues in this case. It did not answer the question whether, setting aside Bonni's allegations that the Hospitals' various disciplinary actions were all motivated by a desire to retaliate against Bonni for his whistleblowing activities, those underlying actions were "of the sort protected by the anti-SLAPP statute." (*Wilson, supra,* 7

Cal.5th at p. 887.)  Because the application of the anti-SLAPP statute to similar claims has generated confusion in California's courts, we retained the case for review and directed the parties to brief the question.

## II.

The anti-SLAPP statute is "designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.]  To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.'  (§ 425.16, subd. (b)(1).)" (*Wilson*, *supra*, 7 Cal.5th at pp. 883–884.)

Litigation of an anti-SLAPP motion involves a two-step process.  First, "the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park*, *supra*, 2 Cal.5th at p. 1061.)  Second, for each claim that does arise from protected activity, the plaintiff must show the claim has "at least 'minimal merit.'" (*Ibid*.)  If the plaintiff cannot make this showing, the court will strike the claim.

The issue before us concerns the first step of this process, determining whether the plaintiff's claims arise from protected activity.  At this first step, courts are to "consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th at p. 1063.)  The defendant's burden is to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily

defined category of protected activity. (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

The anti-SLAPP statute identifies four categories of protected activity. (§ 425.16, subd. (e)(1)–(4).) The Hospitals invoke two of them. Section 425.16, subdivision (e)(2) protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." Subdivision (e)(4) covers "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." We determine de novo whether any of the acts from which challenged claims arise are protected under these provisions. (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

Although the parties agree on these settled principles, they disagree on one critical threshold question about the mechanics of anti-SLAPP review. The Hospitals' anti-SLAPP motion seeks to strike Bonni's retaliation cause of action in its entirety. But that singular cause of action alleges multiple factual bases; the operative complaint contains a nonexhaustive list of at least 19 distinct acts or courses of conduct allegedly undertaken in retaliation for Bonni's complaints of unsafe conditions. Bonni urges that when, as here, a motion has been filed to strike an entire cause of action, a court should not examine the underlying acts individually, but instead should identify the "gravamen" or "principal thrust" of the cause of action and consider only whether that gravamen arises from protected activity. The Hospitals disagree; they insist Bonni's argument is contradicted by our decision in *Baral v. Schnitt*

(2016) 1 Cal.5th 376 (*Baral*). The Hospitals have the better of this debate.

In *Baral*, we addressed how a court should proceed when a plaintiff has pleaded what is sometimes loosely referred to as a " 'mixed cause of action' " — that is, a cause of action that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not. (*Baral, supra,* 1 Cal.5th at p. 382.) We considered and disapproved a line of cases that had held an anti-SLAPP "motion lies *only* to strike an entire count as pleaded in the complaint." (*Ibid.*) Such a rule would allow a plaintiff, through artful pleading, to shield particular allegations of protected activity, themselves sufficient to give rise to a claim for relief, from a motion to strike by intermingling them with unprotected acts. (*Id.* at pp. 387–388, 392–393.) Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief — each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action — to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. (*Id.* at pp. 393–395.)

*Baral* was a second-step anti-SLAPP case, but our instructions for how to handle so-called mixed causes of action began with the first step. At that stage, we said, the moving defendant must identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them. In turn, a court should examine whether those acts are protected and supply the basis for any claims. It does not matter that other unprotected acts may also have been alleged

within what has been labeled a single cause of action; these are "disregarded at this stage." (*Baral, supra*, 1 Cal.5th at p. 396.) So long as a "court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached" with respect to these claims. (*Ibid.*)

Since *Baral*, most Courts of Appeal have taken a claim-by-claim approach to the anti-SLAPP analysis, rather than attempting to evaluate a cause of action as a whole. (See, e.g., *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 772 & fn. 19; *Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1168–1170; see also, e.g., *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 601–602 (conc. & dis. opn. of Rothschild, P. J.).) Bonni, however, relies on post-*Baral* case law suggesting that courts need not employ the *Baral* analysis when a defendant has moved to strike an entire cause of action rather than individual claims within a pleaded count. (*Okorie*, at pp. 588–590). Here, in a motion filed before *Baral* was issued, the Hospitals moved to strike the entire retaliation cause of action. Bonni contends that because the motion aimed at the entire cause of action, we should consider whether the gravamen of the entire cause of action was based on protected or unprotected activity.

We reject the contention: Our holding in *Baral* applies even though the Hospitals sought to strike the entire cause of action, rather than merely parts of it. If we were instead to adopt Bonni's proposed gravamen approach, we would again risk saddling courts with an obligation to settle intractable, almost metaphysical problems about the "essence" of a cause of action that encompasses multiple claims. (*Okorie v. Los Angeles Unified School Dist., supra,* 14 Cal.App.5th at p. 587.) The attempt to reduce a multifaceted cause of action into a singular

"essence" would predictably yield overinclusive and underinclusive results that would impair significant legislative policies. Striking a cause of action that rests in part on unprotected activity constrains a plaintiff's ability to seek relief without advancing the anti-SLAPP's goals of shielding protected activity, which would have been fully served by striking from the complaint only the allegations of protected activity. Conversely, refusing to strike any part of a cause of action that rests in part on protected activity defeats the legislative goal of protecting defendants from meritless claims based on such conduct. Plaintiffs do, of course, have considerable discretion in how to shape their pleadings, and as *Okorie* observed, there is nothing to stop them from "deliberately or innocently" pleading causes of action that "allege both protected and unprotected activity." (*Id.* at p. 590.) But at the end of the day, we do not believe the Legislature in enacting the anti-SLAPP statute intended to make the protections of the anti-SLAPP law turn on a plaintiff's pleading choices. (*Baral*, *supra*, 1 Cal.5th at p. 393.)

Bonni suggests his gravamen approach is justified by waiver principles: if a moving party has not specified which subparts of a cause of action it seeks to strike, the nonmovant should not be put to the burden of parsing the cause of action in the moving party's stead. But this problem already has a solution under well-established anti-SLAPP law — namely, attention to the allocation of the applicable burden of proof. If a cause of action contains multiple claims and a moving party fails to identify how the speech or conduct underlying some of those claims is protected activity, it will not carry its first-step burden as to those claims. (See, e.g., *post*, at p. 34.) The nonmovant is not faced with the burden of having to make the moving party's case for it.

To be clear, we do not suggest that every court that has continued to label its approach a gravamen test even after *Baral* has erred. Some courts have invoked the term not in the way Bonni suggests — to determine the essence or gist of a so-called mixed cause of action — but instead to determine whether particular acts alleged within the cause of action supply the elements of a claim (see *Park, supra*, 2 Cal.5th at p. 1063) or instead are incidental background (see *Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 111 ["The 'gravamen is defined by the *acts on which liability is based*, not some philosophical thrust or legal essence of the cause of action' "]; accord, *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594–601; *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 885–886). This approach is consistent with *Baral*, which reaffirmed that "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra*, 1 Cal.5th at p. 394.)

Here, too, we may consider whether Bonni's various allegations supply the elements of a retaliation claim or merely provide context. But to the extent Bonni has alleged various acts as a basis for relief and not merely as background, each act or set of acts must be analyzed separately under the usual two-step anti-SLAPP framework. The Hospitals bear the burden of showing that each allegation supporting Bonni's claim of recovery is one that rests on protected activity. If the Hospitals carry that burden, Bonni will then need to demonstrate some merit to his claim that those protected acts were taken for impermissible retaliatory reasons; if he cannot, those particular

allegations will be stricken.  Conversely, to the extent any acts are unprotected, the claims based on those acts will survive.[2]

## III.

We first addressed the application of the anti-SLAPP statute to claims arising from peer review in *Kibler, supra,* 39 Cal.4th 192.  The question in *Kibler* was whether medical peer review proceedings fall within the compass of section 425.16, subdivision (e)(2), which protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or *any other official proceeding authorized by law.*"  (Italics added.)  We concluded they do.

As we explained in *Kibler*, medical peer review is the process by which a hospital's medical staff evaluates fellow physicians' professional competence.  Hospital peer review committees, principally composed of physicians selected from the hospital's staff, are charged with maintaining standards for patient care by evaluating the qualifications of those seeking staff privileges and monitoring the performance of those already on staff.  (*Kibler, supra,* 39 Cal.4th at p. 199; *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 10–12; see Bus. & Prof. Code, § 805, subd. (a)(1)(A)(i).)  Though originally adopted by the profession as a purely private process, peer review is now mandated by statute (Bus. & Prof. Code, §§ 2282, subd. (c), 2282.5; *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267) and supplies the foundation for public oversight of the medical profession (see Bus. & Prof. Code, §§ 805, 809–809.9;

---

[2]    We disapprove *Okorie v. Los Angeles Unified School Dist., supra,* 14 Cal.App.5th 574 to the extent it is inconsistent with this decision.

Cal. Code Regs., tit. 22, §§ 70701, 70703; *Kibler*, at p. 199 [describing the "comprehensive scheme that incorporates the peer review process into the overall process for the licensure of California physicians"]).

Peer review is primarily designed to ensure the maintenance of high professional standards and the protection of patient welfare. (Bus. & Prof. Code, § 809, subd. (a)(3), (6); *Mileikowsky v. West Hills Hospital & Medical Center*, *supra*, 45 Cal.4th at p. 1267; *Kibler*, *supra*, 39 Cal.4th at p. 199.) But peer review is also designed to ensure that determinations affecting medical staff privileges are made fairly. Without fair procedures, peer review can be an instrument for arbitrarily or discriminatorily excluding competent practitioners to their detriment and to the detriment of patients who may lose access to health care. (Bus. & Prof. Code, § 809, subd. (a)(4); *Mileikowsky*, at pp. 1267–1268; see Starr, The Social Transformation of American Medicine (2017) pp. 167–168 [noting that in its early days, medical staff control over privileges was used to exclude African-American and Jewish doctors].) The rules governing peer review are designed to guard against arbitrariness and unfairness in decisions about whether a practitioner will be permitted to remain on a hospital staff.

In *Kibler*, we relied on these features of peer review in concluding that peer review proceedings are "official proceeding[s]" within the meaning of section 425.16, subdivision (e)(2). We explained that the governing statutes granted to "individual hospitals, acting on the recommendations of their peer review committees, the primary responsibility for monitoring the professional conduct of physicians licensed in California." (*Kibler*, *supra*, 39 Cal.4th at p. 201.) Peer review decisions affecting a physician's privileges must be reported to

the Medical Board of California, and peer review committees evaluating an application for privileges must obtain from that agency a report of past discipline. (Bus. & Prof. Code, §§ 805, subd. (b), 805.5, subd. (a); *Kibler*, at p. 200.) "Because a hospital's disciplinary action may lead to restrictions on the disciplined physician's license to practice or to the loss of that license, its peer review procedure plays a significant role in protecting the public against incompetent, impaired, or negligent physicians." (*Kibler*, at p. 200.) In addition, peer review decisions are subject to review by administrative mandamus, and in that regard, peer review committees take on the character of quasi-judicial public agencies. (*Ibid.*)

In the wake of *Kibler*, some courts — including the trial court in this case — understood the decision to mean that the anti-SLAPP statute applies to any claim arising from hospital peer review proceedings. But our holding in *Kibler* was significantly more limited, as we later explained in *Park*, *supra*, 2 Cal.5th 1057. The question in *Park* was whether the anti-SLAPP statute protects decisions made in the course of an official proceeding — there, review of the tenure of a professor at a public university. We answered no. We explained that the anti-SLAPP statute protects speech and petitioning activity taken in connection with an official proceeding, but not necessarily the decisions made or actions taken as a result of those proceedings. Under the statute, "a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading

to some different act for which liability is asserted." (*Id.* at p. 1060.) We rejected the university's argument based on *Kibler*, explaining that while *Kibler* had established that peer review proceedings are official proceedings within the meaning of subdivision (e)(2), it had not resolved whether decisions made in the course of those proceedings, in addition to the discussions leading up to those decisions, are protected. (See *Park*, at p. 1069.) We went on to disapprove several Court of Appeal decisions that had interpreted *Kibler* as establishing that any peer review-based decision to impose discipline, including an allegedly retaliatory termination of hospital privileges, is necessarily protected activity. (*Id.* at pp. 1069–1070, disapproving *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 and *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1.)

In short, *Kibler* established no more than that the anti-SLAPP statute is potentially applicable in cases arising from hospital peer review; it did not address the scope of the statute's protections in such cases. We now turn to that question as it is presented here, taking care to differentiate between claims based on protected speech and petitioning activity in connection with peer review proceedings and the disciplinary actions that result. (See *Park*, *supra*, 2 Cal.5th at p. 1060.)

## IV.

## A.

Again, a claim is subject to an anti-SLAPP motion to strike if its elements arise from protected activity. (*Park*, *supra*, 2 Cal.5th at p. 1063.) Courts deciding an anti-SLAPP motion thus must consider the claim's elements, the actions alleged to

establish those elements, and whether those actions are protected. (*Ibid.*)

Bonni's retaliation claims rest primarily on Health and Safety Code section 1278.5, which forbids health facilities from discriminating or retaliating against certain individuals, including medical staff members, for presenting complaints concerning the quality of patient care to other members of the medical staff, the facility, or other responsible entities. (Health & Saf. Code, § 1278.5, subd. (b)(1).) A claim under this statute requires proof of discriminatory treatment, which may be shown by "any unfavorable changes in" a medical staff member's "contract, employment, or privileges . . . or the threat of" such changes. (*Id.*, subd. (d)(2).)[3] The operative complaint alleges that the Hospitals retaliated against Bonni for raising patient care concerns by engaging in 16 principal adverse actions or categories of conduct.[4] Additionally, the complaint asserts that

---

[3] Bonni's complaint identifies two other statutory bases for his retaliation claims — Business and Professions Code sections 510 et seq. and 2056 et seq. Section 510 prohibits retaliation against health care practitioners who advocate for appropriate health care for their patients. (Bus. & Prof. Code, § 510, subds. (a), (b).) Section 2056 similarly prohibits penalizing a physician or surgeon for advocating for patients' health care. (Bus. & Prof. Code, § 2056, subd. (c).) The operative complaint does not differentiate between Health and Safety Code section 1278.5 and these two additional antiretaliation provisions and so, for present purposes, we need not do so either.

[4] According to the complaint, the retaliation "include[d], but [was] not limited to:

"(1) Summarily suspending Plaintiff's medical staff membership and clinical privileges at St. Joseph Health

System, St. Joseph Hospital of Orange and Mission Hospital Regional Medical Center;

"(2) Unilaterally taking retaliatory action against Plaintiff without affording him due process, a hearing, an investigation, or any other meaningful opportunity or procedural protection for Plaintiff to address the summary suspensions before they were issued;

"(3) Reporting Plaintiff's summary suspensions to the Medical Board of California and National [Practitioner] Data Bank, as well as other persons/entities;

"(4) Abusing the powers of the peer review process and subjecting Plaintiff to a lengthy and humiliating peer review process for over two years, and by refusing to lift Plaintiff's summary suspension despite recommendations by several separate boards/committees to do so, challenging the favorable findings of the Judicial Review Committee (JRC) at a hearing which occurred in or around October 2014;

"(5) On December 5, 2014, by having an Appellate Committee recommend to the Board that it reverse the findings of the JRC that had been favorable to Plaintiff;

"(6) On December 18, 2014 by the Board of Trustees adopting the recommendations of the Appellate Committee without any consideration of the favorable findings of the JRC;

"(7) Ongoing hostility in the work environment;

"(8) Obstructing other economic and career opportunities for Plaintiff;

"(9) Failing to protect Plaintiff from retaliation for whistleblowers and adverse actions;

"(10) Intolerable working conditions;

"(11) Engaging in a campaign of character assassination which caused irreparable damage to Plaintiff's reputation;

"(12) Depriving Plaintiff of his property right and interest to use certain hospital facilities and privileges;

the conduct underlying two additional causes of action brought against St. Joseph alone — fraudulently inducing Bonni to enter the settlement agreement, exercising undue influence to force him to sign it, and then breaching that agreement — was also retaliatory. These alleged actions supply a necessary element of the retaliation claims under Health and Safety Code section 1278.5 — the prohibited discriminatory treatment — and so the claims arise from these acts. (See § 425.16, subd. (b); *Park*, *supra*, 2 Cal.5th at p. 1063.) The next step in the analysis is to determine whether each of these actions constitutes protected activity under the anti-SLAPP statute. (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

## B.

Two of the alleged retaliatory actions underlying Bonni's complaint — defamation and "character assassination" — describe quintessential speech activities and thus are protected under section 425.16, subdivision (e)(2) to the extent the speech was made in connection with peer review. (See *Kibler*, *supra*, 39 Cal.4th at p. 200.) Because peer review proceedings are official proceedings, any statements in connection with issues considered in such proceedings — such as criticism of a doctor's competence supplied to a body reviewing his or her hospital privileges — are protected activity under the anti-SLAPP law.

---

"(13) Interfering with Plaintiff's right to practice his occupation;

"(14) Wrongfully terminating Plaintiff's hospital, membership, and clinical privileges;

"(15) Improperly using Plaintiff's confidential and private health information; and

"(16) Making defamatory statements about Plaintiff."

As we explained in *Kibler*, this result reflects a core function of the anti-SLAPP statute in hospital peer review cases. To adequately protect patient welfare, the system depends on the ability of those with expertise to speak frankly about the competence of medical professionals without fear of retribution. To withhold anti-SLAPP protection against harassing lawsuits would chill physicians' willingness to fulfill the essential public functions discharged by peer review committees. (*Id.* at p. 201.)

Bonni asserts that the alleged defamation and character assassination were unconnected to peer review and therefore were not protected by the anti-SLAPP statute. In the alternative, he argues that this speech activity is immaterial to his retaliation claims. Both assertions are belied by Bonni's own filings. On the first point, although Bonni never identifies any specific defamatory statements in the complaint itself, his opposition to the anti-SLAPP motion describes in more detail the alleged course of retaliation against him.[5] The only statements discussed in Bonni's account that would support

---

[5] Some cases have suggested that ambiguous pleading can in some instances make a suit not a SLAPP. (See *Central Valley Hospitalists v. Dignity Health* (2018) 19 Cal.App.5th 203, 218–219; *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 627–628.) Whether or not this is so, here we have considerably more. Even if Bonni's complaint omits specific detail, Bonni's opposition to the anti-SLAPP motion makes clear that the alleged defamation and character assassination include statements protected on account of their nexus to the peer review proceedings. The statute instructs us to take account of those additional allegations in our analysis. (See § 425.16, subd. (b)(2) [courts ruling on anti-SLAPP motions "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based"].)

assertions of defamation or character assassination are statements concerning Bonni's professional competence, made in connection with the peer review consideration of Bonni's standing at the Hospitals. These statements are protected under *Kibler*. (*Kibler*, *supra*, 39 Cal.4th at p. 198; see *Park*, *supra*, 2 Cal.5th at pp. 1069–1070.) As for Bonni's second point, we agree that if Bonni truly meant only to raise these claims as window dressing, there would be no reason to strike them. (See *Baral*, *supra*, 1 Cal.5th at p. 394.) But the complaint makes clear that Bonni intended them to have operative effect: The complaint in no uncertain terms lists the alleged defamation and character assassination as conduct taken in retaliation for his expression of patient care concerns, thus satisfying essential elements of his retaliation claims. If Bonni wishes to abandon the retaliation claims based on defamation and character assassination, he may seek to do so in an appropriate forum. But for present purposes, we will assume his complaint means what it says.

Bonni's complaint raises other instances of protected activity. For one, Bonni alleges the Hospitals retaliated against him by reporting his summary suspensions to the Medical Board of California and National Practitioner Data Bank. These reports qualify as "statement[s] or writing[s] made in connection with an issue under consideration" in an "official proceeding." (§ 425.16, subd. (e)(2).) The reports, which were required by law (see Bus. & Prof. Code, § 805, subd. (e); 42 U.S.C. § 11133(a)(1)), are written statements to the state's licensing agency concerning restrictions imposed on Bonni by a peer review body for allegedly providing substandard care. (See *Kibler*, *supra*, 9 Cal.4th at p. 200 [emphasizing the role peer review plays in

state licensure].)[6]   The same is true of Mission's medical executive committee's arguments before the peer review panel that the suspension should be upheld, as well as Mission's appellate committee's recommendation that some of the preliminary findings reached by that peer review panel should be reversed.[7]   These statements of defendants' views on a pending peer review matter fall within the scope of protected activity as defined in section 425.16, subdivision (e)(2).  And the same necessarily follows for Bonni's allegation that defendants injured him by subjecting him to a "lengthy and humiliating peer review process," a general allegation that rests in part on

---

[6]   Although the summary suspensions were each initially imposed by the respective individual hospital chiefs of staff, they were immediately reviewed and preliminarily upheld by the respective medical executive committees, which are peer review bodies under state law.  (See Bus. & Prof. Code, § 805, subd. (a)(1)(B).)  The legally required reporting of those peer-imposed suspensions falls within the express language of Code of Civil Procedure section 425.16, subdivision (e)(2).

[7]   In determining whether a physician should be subject to discipline, Mission's bylaws give no special weight to the arguments of the medical executive committee, which are treated like the arguments of any advocate.  The peer review body, the judicial review committee, is to decide the matter based on an independent assessment of the evidence presented. (Mission Bylaws, art. X, § 9(A); see generally *id.*, art. X, §§ 1–9.) Likewise, the decision of the appellate committee in reviewing the judicial review committee's decision is entitled to no weight; although that decision is forwarded to the governing board of trustees, the board is required to exercise its "independent judgment" in determining whether the judicial review committee's decision should be upheld.  (See Mission Bylaws, art. X, § 10(G).)  The communications Bonni challenges are thus just that — statements on a matter under consideration — and not akin to final decisions.

these statements and more — essentially everything any defendant said in the course of the peer review process in support of limiting Bonni's privileges.

Bonni does not appear to dispute that the reports and recommendations are protected activity but argues instead that his claims do not arise from them. The Hospitals' reports of his suspensions, he now says, were simply the "natural consequence" of the acts that actually harmed him, the underlying suspensions and ultimate losses of staff privileges. But the fact remains that the complaint alleges these reports as separate acts of retaliation. What is more, Bonni's declaration submitted in opposition to the anti-SLAPP motion separately describes the harm he suffered as a result of the allegedly retaliatory reports, when another hospital rescinded a job offer after it obtained the public report of his discipline. Again, we take Bonni's pleadings at face value.

Bonni similarly argues that the Mission medical executive committee's recommendations led to the acts that harmed him — the loss of privileges — but were not themselves a source of harm. At most, he says, the recommendations supply evidence of retaliatory animus. But Bonni's complaint expressly alleges that committee's challenge to peer review findings favoring Bonni was an act of retaliation. Bonni's claim arises from that act because it supplies an element of the claim: The retaliation statute defines actionable "discriminatory treatment" to include both an actual "suspension" or "unfavorable change[] in . . . [the] privileges of the . . . member of the medical staff" *and* "the threat of any of these actions." (Health & Saf. Code, § 1278.5, subd. (d)(2).) Bonni's claim, in effect, is that defendants threatened the loss of his privileges by recommending as much in the peer review process. This

25

framing makes out a cognizable retaliation claim, but it also makes that claim susceptible to anti-SLAPP review.

Because each of his claims of retaliation based on statements in connection with peer review proceedings arises from protected activity, on remand Bonni will need to demonstrate at least some "minimal merit" to the claims. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) If he cannot, these allegations will be stricken from his pleadings. (*Wilson, supra,* 7 Cal.5th at p. 884.) That does not mean the underlying factual allegations may not be mentioned in the course of any ensuing proceedings; to the extent Bonni does consider these allegations to be probative of defendants' motives or relevant to any other claims that survive, statements made in the course of peer review proceedings remain as admissible as any others. As our discussion in *Park* of the relevant precedent illustrates, communicative activities often may supply evidence of illicit animus even if they do not in themselves supply a basis for liability. (See *Park, supra,* 2 Cal.5th at pp. 1064–1067.) But if the claims are stricken from the pleadings for lack of merit, Bonni may no longer seek to impose liability on defendants for having engaged in these protected acts.

## C.

The allegations just identified as protected activity under section 425.16, subdivision (e)(2) all involve statements made in connection with an official proceeding. But the operative complaint also alleges retaliation through various adverse actions — most prominently, the suspension and eventual

termination of Bonni's hospital privileges.[8] While *Kibler* established that communications in connection with peer review proceedings are protected under subdivision (e)(2) (*Kibler*, *supra*, 39 Cal.4th at p. 198), it did not address whether decisions made in the course of peer review proceedings were likewise entitled to protection (see *Park*, *supra*, 2 Cal.5th at pp. 1069– 1070; *ante*, at pp. 17–18). To make their first-step showing with respect to the suspension and termination of Bonni's staff privileges, the hospitals must show that those actions themselves constituted "act[s] . . . in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)

The Hospitals acknowledge the limits of *Kibler* and the significance of the distinction drawn in *Park* between adverse decisions and the communications giving rise to those decisions. They offer no argument that Bonni's retaliation claims based on adverse actions aim at activity that is protected under section 425.16, subdivision (e)(2). These disciplinary actions are not "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (*Ibid.*) But the Hospitals contend that these disciplinary actions are nonetheless protected under section 425.16, subdivision (e)(4), which covers "any other conduct in furtherance of the exercise of the constitutional right of petition

---

[8] The complaint alleges that the Hospitals retaliated against Bonni by (1) suspending his privileges unilaterally and (2) ultimately terminating his privileges, thereby (3) interfering with his ability to practice.

or the constitutional right of free speech in connection with a public issue or an issue of public interest."

By its terms, section 425.16, subdivision (e)(4) extends protection not just to speech and petitioning but to certain conduct "in furtherance of" speech and petitioning. It does not, however, "define precisely how, or to what extent, conduct must further the exercise of speech or petition rights to merit protection." (*Wilson, supra,* 7 Cal.5th at p. 893.) We are not presented here with allegations of expressive conduct — "the burning of flags, the wearing of armbands, and the like" (*ibid.*), acts that themselves serve to communicate views on a matter of public significance — but rather with ancillary acts alleged to facilitate a defendant's speech or petitioning rights. Applying the same analysis we developed in *Wilson* for such ancillary acts, the question is whether Bonni's suspension and the later nonrenewal of his privileges furthered the Hospitals' speech or petitioning rights because they bore some "substantial relationship" to the Hospitals' "ability to [petition or] speak on matters of public concern." (*Id.* at p. 897.)[9]

---

[9] We recently articulated a general two-step analysis for determining whether speech is protected under the anti-SLAPP statute's catchall provision: "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates — a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest," a question we answer by examining the speech's context. (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149–150 (*FilmOn*); see *Wilson, supra,* 7 Cal.5th at pp. 884–885.) In *FilmOn,* we resolved a dispute over whether the private dissemination of

The Hospitals argue that physician disciplinary decisions further their speech and petitioning on "an identifiable matter of public interest: patient safety." They point to a Court of Appeal case that held speech concerning the competence of a single licensed physician could qualify as speech on a public issue within the meaning of section 425.16, subdivision (e)(4). (See *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 947–949 [applying *FilmOn, supra*, 7 Cal.5th 133].) We need not decide whether *Yang* was correct, for even assuming it was, it does not help the Hospitals here. All alleged *statements* by the Hospitals and individual doctor defendants concerning Bonni's

commercial reports was "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) The parties' dispute did not hinge on whether the dissemination of the reports constituted "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech." (*Ibid.*)

The two-part *FilmOn* inquiry will often be dispositive in cases concerning the reach of the catchall provision. But in instances where it is unclear whether apparently noncommunicative acts qualify as "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech" (§ 425.16, subd. (e)(4)), a court may need to also examine that question, as we did in *Wilson, supra*, 7 Cal.5th 871 and as we must do here. In doing so, a court should attend to contextual factors such as the purpose of the conduct at issue, as courts do under *FilmOn* when they examine whether any speech or petitioning is "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); see *Wilson*, at p. 898 [news organization's ability to broadcast and publish on public issues, and meaningfully participate in public discourse on these issues, depended on its credibility, so a staffing decision based on a key credibility harm such as plagiarism "qualifies as 'conduct in furtherance' of CNN's 'speech in connection with' [a] public matter. (§ 425.16, subd. (e)(4).)"].)

competence are, as addressed in the previous section, protected under subdivision (e)(2). The remaining issue is whether the adverse actions the Hospitals took, based on their view that Bonni's competence was suspect, are likewise shielded. We conclude the anti-SLAPP statute does not extend so far. Our conclusion turns on the fact that the Hospitals have not drawn any connection between their disciplinary actions and their petitioning or speech abilities — irrespective of whether those actions might relate to a matter of public interest.

At bottom, disciplining a doctor based on the view that the doctor's skills are deficient is not the same thing as making a public statement to that effect. The latter is, or may be, speech on a matter of public concern. The former is not speech at all. (See *Smith v. Adventist Health System/West* (2010) 190 Cal.App.4th 40, 60 [summary suspension of physician's staff privileges is "a noncommunicative act"].) Treating disciplinary acts indistinguishably from speech — such that if stating a given viewpoint would warrant constitutional and anti-SLAPP protection as an exercise of free speech rights, the same protection should extend equally to any actions motivated by that viewpoint — assumes, at root, that conduct generally is tantamount to speech. But expression and nonexpressive acts do not have equal stature in First Amendment law. An employer has the constitutional right to express opposition to antiretaliation laws, for example, but the employer has no equivalent right to fire an employee in retaliation for whistleblowing activity. (Cf. *Hishon v. King & Spalding* (1984) 467 U.S. 69, 78 [prohibition on sex discrimination in private employment does not infringe constitutional right of expression].) The scope of the protection afforded by the anti-SLAPP statute may not precisely track the lines drawn under

the First Amendment and state Constitution (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 421), but we see no evidence the Legislature intended to discard this well-established distinction when it enacted section 425.16, subdivision (e)(4). (See *Wilson, supra,* 7 Cal.5th at p. 893 & fn. 9 [discussing legislative history of § 425.16, subd. (e)(4)].) On the contrary, as we have elsewhere made clear, even if the statute shields statements about an individual's qualifications, the Legislature did not necessarily also intend to shield all actions motivated by those views. (See, e.g., *Park, supra,* 2 Cal.5th at pp. 1068–1073 [whether or not statements about professor's qualifications might have been protected, the decision based on those communications was not].)

Of course, the Hospitals need not prove their disciplinary actions represented "expressive" conduct — tantamount to a report on their commitment to patient safety — to successfully meet their burden under section 425.16, subdivision (e)(4). By covering "any other conduct in furtherance of" protected speech and petitioning (*ibid.*), the subdivision extends to communicative and noncommunicative acts (see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, pp. 3–4; *Wilson, supra,* 7 Cal.5th at p. 893 & fn. 9). Our inquiry here turns instead on whether the Hospitals' conduct advances the Hospitals' "*ability* to speak [or petition] on matters of public concern." (*Wilson,* at p. 897, italics added; see *id.* at p. 896 [the "ability to speak on public issues . . . is the anti-SLAPP statute's concern"].) No connection between the Hospitals' choice of which doctors should receive staff

privileges and its ability to speak or petition on public issues is apparent.[10]

The Hospitals emphasize that disciplining Bonni triggered a peer review hearing, an official proceeding during which the Hospitals' medical executive committee petitioned in support of its action, and the suspensions supplied the occasion for reports to the Medical Board of California and National Practitioner Data Bank. Those reports are, as we have discussed, the sort of petitioning activity the anti-SLAPP statute protects. And it is true that the suspensions of Bonni were a "but for" cause of those protected acts — no suspension, no proceedings or reports. But that sort of causal link does not mean the suspensions advanced the Hospitals' ability to speak or to petition on matters of public concern in any substantial way. Suspension or no, the Hospitals were perfectly free to express views about Bonni's competence. Likewise, nothing in the Hospitals' bylaws would have prevented them from initiating a peer review evaluation of his competence even without a suspension. Indeed, the record here indicates Mission did initiate such an evaluation months before it suspended and eventually declined to renew Bonni's staff

---

[10] In *Wilson, supra,* 7 Cal.5th 871, we acknowledged that some staffing decisions by a news organization in the business of speaking on matters of public importance to the public, specifically those tied to selecting individuals with control over the organization's message, might qualify as conduct in furtherance of the organization's speech on matters of public importance. (*Id.* at p. 896.) But, like the university defendant in *Park, supra,* 2 Cal.5th at page 1072, which failed to develop an argument that its choice of faculty had any similar impact, the Hospitals have not shown how their selection of doctors furthers the Hospitals' own speech or petitioning.

privileges.[11] Section 425.16, subdivision (e)(4) does not extend protection to every bit of conduct factually related to actual speech or petitioning.

Finally, the Hospitals argue anti-SLAPP protection for physician disciplinary decisions is necessary lest the risk of frivolous suits chill such decisions and jeopardize patient safety. Enhanced patient safety is surely a worthy policy goal, but it is not the concern of the anti-SLAPP statute, which is aimed instead at protecting the exercise of speech and petitioning rights on matters of public significance. (§ 425.16, subd. (a); *FilmOn, supra,* 7 Cal.5th at p. 143; *Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321.)[12] Nor have the Hospitals presented any specific evidence to support the contention that denying anti-SLAPP protection to the ultimate peer review decisions would chill hospitals from making appropriate disciplinary decisions based on the information received in the peer review process — the communication of which *is* subject to anti-SLAPP protection. (Cf. *Park, supra,* 2 Cal.5th at p. 1071 ["deny[ing] protection to individuals weighing in on a public entity's decision might chill participation from a range of voices

---

[11] The Hospitals' briefing suggests that the primary impact a summary suspension has on peer review is that it triggers certain hearing rights for the *disciplined physician,* which the physician can choose to exercise or waive. But the Hospitals provide no explanation why conduct that empowered Bonni to exercise hearing rights furthered their own right to petition.

[12] The same point addresses the Hospitals' observation that summary suspensions may make peer review proceedings safer, ensuring that allowing physicians a fair process does not come at the expense of patient welfare. Even assuming this is so, it does not demonstrate that summary suspensions enhance the Hospitals' ability to speak or petition.

desirous of offering input on a matter of public importance. But no similar concerns attach to denying protection for the ultimate decision itself"].)

In sum, the Hospitals have not shown physician disciplinary decisions, such as the summary suspension and eventual termination of privileges underlying many of Bonni's retaliation claims, are entitled to protection under the anti-SLAPP statute.

## D.

The complaint also identifies a handful of miscellaneous retaliatory conduct not explicitly tied to any specific event or action: that the Hospitals created a hostile work environment, blocked Bonni from career opportunities, failed to protect him from retaliation, subjected him to intolerable work conditions, and misused his private, confidential health information. The burden is on the Hospitals to demonstrate that each of these allegations entails protected activity. (*Wilson, supra,* 7 Cal.5th at p. 884.) In the trial court, the Hospitals did not address Bonni's allegations individually. In this court, they offer no argument directed at these allegations and do not explain how they arise from peer review proceedings or any other protected activity. Accordingly, they have not carried their burden.

## E.

In addition to the undifferentiated retaliation allegations pleaded against all defendants, the complaint alleges St. Joseph and its related entities retaliated by first using undue influence or fraud to persuade Bonni to settle his dispute with them and then breaching that settlement agreement by reporting Bonni's resignation to the Medical Board of California and National

Practitioner Data Bank using language that deviated from that agreed to by the parties.

The filing of a lawsuit is an exercise of the First Amendment right to petition the government. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291; *Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 736, fn. 5; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) Consequently, claims that arise out of the filing of a suit arise from protected activity for purposes of the anti-SLAPP statute. (*Jarrow Formulas*, at pp. 734–735.) The same is true of discussions that precede the filing of a suit: " '[J]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], . . . such statements are equally entitled to the benefits of section 425.16.' " (*Briggs*, at p. 1115.)

Settlement negotiations while a suit is pending are likewise protected; they involve communications in connection with a matter pending before or under consideration by an official body, and so fall within the scope of section 425.16, subdivision (e)(2). (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 90; *O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC* (2019) 42 Cal.App.5th 546, 566–568; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 962–964; *GeneThera, Inc. v. Troy & Gould Professional Corp.* (2009) 171 Cal.App.4th 901, 907–908.)

We deal here with a claim arising out of settlement negotiations preceding the filing of any suit. But we nevertheless conclude such negotiations, no less than postfiling settlement negotiations or communications in anticipation of filing, are protected activity for anti-SLAPP purposes. In

determining what constitutes protected petitioning activity, "we must give adequate 'breathing space' to the right of petition." (*Sosa v. DIRECTV, Inc.* (9th Cir. 2006) 437 F.3d 923, 932, quoting *BE&K Constr. Co. v. NLRB* (2002) 536 U.S. 516, 531.) "The right to petition means more than simply the right to communicate directly with the government. It necessarily includes those activities reasonably and normally attendant to effective petitioning." (*In re IBP Confidential Business Documents Lit.* (8th Cir. 1985) 755 F.2d 1300, 1310.) Recognized petitioning activities thus include not only the conduct of litigation but also acts and communications reasonably incident to litigation, including prelitigation settlement negotiations. (See *Coastal States Marketing, Inc. v. Hunt* (5th Cir. 1983) 694 F.2d 1358, 1367 [protection for petitioning activity should extend to a prelitigation "effort to compromise the dispute"]; *Globetrotter Software v. Elan Computer Group, Inc.* (Fed.Cir. 2004) 362 F.3d 1367, 1376 [agreeing with *Coastal States*]; *McGuire Oil Co. v. Mapco, Inc.* (11th Cir. 1992) 958 F.2d 1552, 1560 [agreeing with *Coastal States*]; *Long Canyon v. Cashion* (Tex.Ct.App. 2017) 517 S.W.3d 212, 220–222 [presuit demand letters are constitutionally protected petitioning activity for purposes of Texas's equivalent to the anti-SLAPP statute].) Consistent with this view, those Courts of Appeal to consider the question have concluded the anti-SLAPP statute protects prelawsuit settlement negotiations, whether emanating from the would-be plaintiff or the would-be defendant. (*Takhar v. People ex rel. Feather River Air Quality Management Dist.* (2018) 27 Cal.App.5th 15, 28–29; *Karnazes v. Ares* (2016) 244 Cal.App.4th 344, 353.)

Here, the retaliation claim rests in part on St. Joseph's settlement negotiations with Bonni. Although Bonni alleges

fraud in the course of those negotiations, that allegation does not remove them from the definition of protected activity. (See *Navellier v. Sletten, supra*, 29 Cal.4th at pp. 87, 90; *Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 841–842; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1418–1420.)

The last pleaded retaliatory act is St. Joseph's alleged breach of the parties' settlement agreement by communicating with the Medical Board of California using unauthorized language. A breach of contract claim can arise from protected activity if the action allegedly breaching the contract is itself protected. (Compare *Navellier v. Sletten, supra*, 29 Cal.4th at pp. 90–91 [breach of settlement claim arose from protected petitioning activity, filing claims in court in alleged violation of a prior release] and *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1408–1409 [same] with *Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc.* (2008) 164 Cal.App.4th 1108, 1118 [breach of settlement claim did not arise from protected activity where acts constituting breach not exercise of speech or petitioning rights].) As discussed above, St. Joseph's communication to the Medical Board was protected activity, and so Bonni's claim that St. Joseph retaliated by breaching the parties' settlement agreement likewise arises from protected activity.

## V.

In sum, the Hospitals have demonstrated that some but not all of the claims collected together as unlawful acts of retaliation in Bonni's first cause of action arise from protected speech or petitioning activity: reporting Dr. Bonni's summary suspension and advocating in peer review proceedings that it be

upheld (First Amended Complaint for Damages, ¶ 16, subparas. (3)–(5)); criticizing Dr. Bonni's professional abilities in the course of peer review proceedings (*id.*, ¶ 16, subparas. (11), (16)); and inducing Dr. Bonni to settle his dispute with St. Joseph and then allegedly breaching that settlement by filing a nonconforming report with the Medical Board of California (*id.*, ¶ 16, addtl. subparas. (1)–(3)). The remaining allegations do not arise from protected activity.

Echoing other courts, the Court of Appeal here expressed concern that discrimination and retaliation claims should "rarely, if ever" be seen as appropriate targets of an anti-SLAPP motion. (*Bonni*, *supra*, 13 Cal.App.5th at p. 864.) We agree that the anti-SLAPP statute has a limited role to play in such suits. As we said in *Wilson*, "[w]e see no realistic possibility that anti-SLAPP motions will become a routine feature of the litigation of discrimination or retaliation claims." (*Wilson*, *supra*, 7 Cal.5th at p. 890.) This case is no exception to the rule; as we have explained, the disciplinary actions central to Bonni's retaliation cause of action do not constitute protected activity and thus are not subject to a special motion to strike under the anti-SLAPP statute. To the extent Bonni's cause of action seeks to impose liability not for disciplinary actions but for statements made in the course of hospital peer review proceedings, the statute entitles the Hospitals to seek early review of the merits of Bonni's claims, just as they would be permitted to seek early review of any other claim arising from protected activity. We reiterate, however, that while this is the conclusion that follows from the statute as written, the Legislature remains free to adjust the statutory scheme's application to discrimination and retaliation claims if it so chooses. (See *id.* at p. 892.)

The Court of Appeal reversed the trial court based on a determination that the Hospitals had not met their first-step burden. It thus did not have occasion to review the trial court's further conclusion that Bonni had failed to satisfy his second-step burden. We reverse in part the Court of Appeal's first-step determination and remand for it to consider in the first instance whether Bonni has met his second-step burden for those discrete claims arising from protected activity. (See *Navellier v. Sletten, supra,* 29 Cal.4th at p. 95.)

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**
**JENKINS, J.**

BONNI v. ST. JOSEPH HEALTH SYSTEM

S244148

Concurring Opinion by Justice Groban

The majority opinion concludes the anti-SLAPP statute (see Code Civ. Proc., § 425.16[1]) applies when a plaintiff's retaliation claim is "based on statements in connection with peer review proceedings." (Maj. opn., *ante*, at p. 25.) I fully concur with this conclusion. The majority opinion also finds the anti-SLAPP statute does not apply when a plaintiff alleges that statements made in connection with a peer review proceeding demonstrate the disciplinary decisions resulting from those statements were motivated by retaliatory animus. (See *id*. at pp. 25–26.) I agree this conclusion is compelled by our prior holdings in *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057 (*Park*) and *Wilson v. Cable News Network, Inc*. (2019) 7 Cal.5th 871 (*Wilson*). (See maj. opn., *ante*, at pp. 26, 37–38; *Park*, at p. 1060 ["a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity . . . . Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of"]; *Wilson*, at p. 890 ["the defendant in a discrimination suit must show that the complained-of adverse action, in and of itself, is an act in furtherance of its speech or petitioning rights. Cases that fit that description are the exception, not the rule"].) I write

---

[1] All further statutory citations are to the Code of Civil Procedure.

1

separately, however, to express my view that our now-settled construction of section 425.16 does appear to erode the protections that statements made in connection with peer review and other "official proceeding[s]" (§ 425.16, subd. (e)(2)) would otherwise enjoy.

Plaintiff Aram Bonni alleges, inter alia, that the hospital defendants retaliated against him by making false statements at the peer review proceedings regarding his competency. (See maj. opn., *ante*, at pp. 21–22.) The majority opinion concludes the anti-SLAPP statute applies to this claim because the defendants' protected statements "supply the basis" for the claim. (*Id.* at p. 11; see *id.* at pp. 21–23.) The majority opinion further finds, however, that Bonni could have avoided application of the statute by instead alleging that the defendants' false statements at the peer review proceedings prove that subsequent disciplinary acts were retaliatory. (See *id.* at pp. 26–27.) In that circumstance, the statements would receive no protection because they would merely "supply evidence of illicit animus" (*id.* at p. 26) rather than "supply the basis" (*id.* at p. 11) for the claim. Thus, under our reasoning, it appears the following allegation would trigger anti-SLAPP protection: "After I reported safety concerns, the employer retaliated against me by making false statements at the peer review proceedings and then terminating my employment based on those false statements." But the plaintiff could avoid the statute by alleging: "After I reported safety concerns, the employer retaliated against me by terminating my employment. That retaliatory animus is evidenced by false statements made at the peer review proceedings."

While consistent with our prior decisional law (see *Park*, *supra*, 2 Cal.5th at p. 1060; *Wilson*, *supra*, 7 Cal.5th at p. 890),

that conclusion has curious consequences where, as here, it seems clear Bonni cannot prove the hospital defendants' disciplinary decisions were retaliatory without first persuading the jury that the statements against him at the peer review proceedings were themselves false and retaliatory.[2] If a plaintiff cannot prove his or her claim without persuading a jury that protected statements were false, one might reasonably think the claim "aris[es] from" (§ 425.16, subd. (b)(1)) those statements. *Park*, however, rejected such reasoning, and *Wilson* reaffirmed that view.

Although I join the majority opinion's application of our prior case law, I am less persuaded that our construction of the anti-SLAPP statute will have no conceivable chilling effect on free participation in official proceedings. (See maj. opn., *ante*, at p. 33.) We have previously held that the Legislature's purposes in enacting the anti-SLAPP statute are "best served . . . by a construction of section 425.16 that broadly encompasses participation in official proceedings, generally, whether or not such participation remains strictly focused on 'public' issues." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118.) In *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, we further held that peer

---

[2]  In his declaration filed in support of the opposition to the anti-SLAPP motion, Bonni asserts the allegations defendants made against him at the peer review proceedings — that his treatment of patients fell below the standard of care — "were false and brought . . . in retaliation for [his] reports related to patient safety." If the jury rejects those factual assertions and instead concludes the hospital defendants acted in good faith during the peer review process, it is difficult to conceive how Bonni could possibly prevail on any retaliation claim involving the defendants' disciplinary actions.

review qualifies as a form of " 'official proceeding' " that "serves an important public interest." (*Id*. at p. 199.) Denying protection to statements made in connection with peer review proceedings, we reasoned, would "discourage participation in peer review by allowing disciplined physicians to file harassing lawsuits against hospitals and their peer review committee members." (*Id*. at p. 201; see maj. opn., *ante*, at p. 21 ["To withhold anti-SLAPP protection against harassing lawsuits [based on statements in connection with peer review proceedings] would chill physicians' willingness to fulfill the essential public functions discharged by peer review committees"].) Arguably, denying protection when "disciplined physicians . . . file harassing lawsuits" (*Kibler*, at p. 201) that claim false statements made during peer review proceedings show the resulting discipline was retaliatory will have an identical effect. Indeed, if hospital administrators were to ask their attorney whether statements at peer review proceedings would be protected in the event a physician were to later bring suit, it seems the most reasonable answer under our current jurisprudence would be, "not really." That such protection might apply if the physician were to proceed under a theory of defamation, but not if the physician utilized the statements as crucial evidence in proving the discipline was retaliatory, would seem to provide little comfort to those participating in the peer review process.

Nonetheless, this is the dividing line that our case law compels. As the majority opinion notes, if the Legislature believes our construction is inadequate to protect statements made in connection with peer review and other "official proceeding[s]" (§ 425.16, subd. (e)(2)), it "remains free to adjust the statutory scheme[]." (Maj. opn., *ante*, at p. 38.)

**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Bonni v. St. Joseph Health System

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 13 Cal.App.5th 851
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S244148
**Date Filed:** July 29, 2021

---

**Court:** Superior Court
**County:** Orange
**Judge:** Andrew P. Banks

---

**Counsel:**

Greene, Broillet & Wheeler, Mark T. Quigley, Scott H. Carr, Christian T.F. Nickerson; Esner, Chang & Boyer, Stuart B. Esner and Joseph S. Persoff for Plaintiff and Appellant.

Arent Fox, Lowell C. Brown, Debra J. Albin-Riley, Karen Van Essen and Diane Roldán for Defendants and Respondents.

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen Wener Shenfeld and Joanna S. McCallum for Dignity Health, Sutter Health, Adventist Health, MemorialCare and Sharp Healthcare as Amici Curiae on behalf of Defendants and Respondents.

Horvitz & Levy, Jeremy B. Rosen, Felix Shafir, John F. Querio and Megan S. Wilson for California Hospital Association as Amicus Curiae on behalf of Defendants and Respondents.

Francisco J. Silva, Stacey B. Wittorff, Joseph M. Cachuela; Athene Law and Long X. Do for California Medical Association as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Debra J. Albin-Riley
Arent Fox LLP
555 West Fifth St., 48th Floor
Los Angeles, CA 90013
(213) 443-7545

Stuart B. Esner
Esner, Chang & Boyer
234 East Colorado Blvd., Suite 975
Pasadena, CA 91101
(626) 535-9860